IN THE MATTER OF THE ESTATE OF DORA F. JOHNSTON, DECEASED. JOHN A. ROWLAND, EXECUTOR, APPELLEE, SAMUEL F. PARKER, ET AL., APPELLEES, V. JESSIE D. RALSTON, APPELLANT.

25 N. W. 2d 526

FILED JANUARY 3, 1947.   No. 32103.

*Cook & Cook* and *Harold A. Prince,* for appellant.

*W. A. Stewart, Jr.,* and *F. J. Schroeder,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ., and POLLOCK, District Judge.

WENKE, J.

This action arises by reason of Jessie D. Ralston objecting to the probate of the will of Dora Frances Johnston, deceased, when offered for probate by John A. Rowland who is named executor therein.

From an order of the district court for Dawson County sustaining a motion for a directed verdict and admitting the will of the deceased to probate, her motion for new trial having been overruled, the contestant appeals.

The parties agree that the appeal presents the following propositions: Was there evidence requiring the issue of undue influence to be submitted to the jury; and did the court erroneously exclude any competent, relevant, and material evidence on the issue of undue influence?

The burden of proof to establish undue influence is on the party so alleging. In re Estate of Hagan, 143 Neb. 459, 9 N. W. 2d 794; In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80.

"In making proof, a contestant is not limited to the bare facts that he may be able to adduce, but he is entitled to the benefit of all inferences which may be legitimately derived from established facts." In re Estate of Bowman, 143 Neb. 440, 9 N. W. 2d 801.

"Undue influence, in order to invalidate a will, must be of such character as to destroy the free agency of the testator and substitute another person's will for his own." In re Estate of Bowman, *supra.* See, also, In re Estate of George, *supra.*

"The elements necessary to be established to warrant the rejection of a will on the ground of undue influence are: (1) That the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) ·that there

was a disposition to exercise it; (4) that the result appears to be the effect of such influence." In re Estate of George, *supra*.

Dora Frances Johnston died on June 25, 1945, a resident of Farnam, Dawson County, Nebraska. She was a widow at the time of her death and left as her immediate family and other relatives, all of whom are named in her will as either devisees or legatees, the following: Jessie D. Ralston, a daughter; John Ralston, a grandson; Jean Ralston, a granddaughter; the grandchildren being children of Jessie D. and Pree Ralston; Minnie T. Parker, a sister; Samuel F. Parker, a brother-in-law; Sarah J. Parker, a niece; Margarette Rowland, a niece; and Louise Lindvall, a niece; the nieces all being children of Minnie T. and Samuel F. Parker.

There are others referred to in the evidence who are related to the deceased by marriage but such relationship will be shown if it becomes necessary to refer to such testimony.

The will here involved was executed on September 9, 1941, and, insofar as it provides for the distribution of the assets of the deceased, is a duplicate of a previous will executed on November 24, 1934. This new will was drawn solely because of the death of the executors named in the previous will of 1934 and a codicil thereto, executed on December 15, 1939.

The will offered for probate provides as follows: To her daughter, Jessie D. Ralston, the life use of the east half of Section 29, Township 9 north, Range 25, west of the 6th P. M., in Dawson County, and at her death to the heirs of her body; to the grandson, John Ralston, Lots 14 and 15 in Block 10 in the original town of Farnam; to the granddaughter, Jean Ralston, Lots 13 and 14 in Block 3 in the original town of Farnam, Lots 7, 8, 9, and 10 in Block 10 in the original town of Farnam, Lots 1, 2, 3, 4, 5, and 6 in Block 1 in the third addition to Farnam, and Lot 1 in Block 1 in the second addition to Farnam; to her sister, Minnie T. Parker, all stock in the Farnam Bank (59½ shares) and a one-half interest in Lots 15, 16, 17, and 18 in Block 7 in the original town of Farnam and a one-half in-

terest in Lot 1 in the southwest addition to the town of Farnam; to her brother-in-law, Samuel F. Parker, all of the real estate owned in Frontier County which property is situated in the town of Curtis and adjacent thereto, being the property acquired in the Roth foreclosure; to each of the three nieces, Margarette Rowland, Louise Lindvall, and Sara J. Parker, the sum of $1,000; all the rest, residue, and remainder of the property, either real or personal, after payment of all debts and funeral expenses as in said will provided, to her sister and brother-in-law, Minnie T. Parker and Samuel F. Parker, share and share alike.

The residue of the estate, both real and personal, not in the will specifically bequested or devised is, according to the inventory filed by the special administrator, of the approximate value of $20,238.75. This would be subject to the three bequests of $1,000 each and the debts, funeral expenses, and costs of administration, the amount of which is not shown but which is estimated at about $2,500.

This will contains this further provision: "My object in dividing my property in the foregoing manner is to give my daughter and grandchildren the property I have heretofore received, from my husband; the property I received from my father to my sister, and the residue as designated, to the Parker family for S. F. Parker's success in handling my affairs all these years."

"A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives therein, nor does it put any obstacle in the way of the aged or infirm in making disposition of their property by will; provided, only, that their mentality conforms to the accepted tests at the time of the execution of such testamentary instrument." In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513.

Dora Frances Johnston was born on December 22, 1858. She was a daughter of Mason J. and Isabelle Tufts. She came to Dawson County with her parents in 1883. The only other member of the family is her sister Minnie T. Parker, nee Tufts. On May 28, 1884, Dora married William John-

ston. Thereafter they made their home on a farm near Farnam in Dawson County until he died on October 6, 1915.

To this marriage one child was born, Jessie D. Ralston, the contestant here. The daughter married Pree Ralston in 1907. He was a banker by profession and immediately after the marriage they made their home in Wellfleet. They lived there until 1911 when they moved to Brady. They then lived in Brady until 1917 when they moved to Cozad where they resided until 1941. However, after the bank holiday of 1933 her husband was no longer connected with a bank but only engaged in such odd jobs as he could find. In this loss of his employment he also lost all of their property except their home and at the time of the mother's death they had accumulated very little in addition thereto.

Three children were born to the daughter. One died in infancy and the other two are the grandchildren named in the will, to wit: John Ralston and Jean Ralston.

Deceased's sister married Samuel F. Parker in 1893 and, until 1898, they made their home on a farm near Farnam. In 1898, they moved to Farnam and he there engaged in the profession of banking and was so engaged at the time of the trial, being connected with the Farnam Bank. Three daughters were born to this marriage and are the nieces named in the will and to each of whom is bequeathed the sum of $1,000. They are Sara J. Parker, Margarette Rowland, and Louise Lindvall.

All of these people are of age. In fact the principal parties have or had reached rather mature years. The deceased, at the time of her death, was 86 years of age and her sister was 12½ years her junior. Samuel F. Parker, the brother-in-law, was 82 years of age at the time of the trial.

After her husband died the deceased moved to Farnam where she made her home until she died. She lived in the immediate neighborhood of her sister and brother-in-law and the other members of their family. Visiting back and forth occurred daily or oftener and whenever the Parkers took their car for rides or trips the deceased was almost always a passenger. She was an active worker in her church,

took an interest in civic affairs, and was very loyal to her community and its activities. During these years she also traveled considerably for a person of her age.

While her daughter never lived in Farnam, except on occasions when they stayed in the mother's home while they were moving from one town to another, however, the places where they lived were not far from Farnam and they visited back and forth on frequent occasions. This continued even after 1941 when the daughter's family left Cozad and went first to Denver, Colorado, then to Fort Collins, Colorado, and later to Grand Island, Nebraska, where they were living when the mother passed away.

The evidence presents a picture of a mother who maintained the most friendly social relations with the daughter and her family. Likewise it presents a picture where she maintained the same friendly relations with the sister and her family. During the many years she lived in Farnam, after she moved from the farm in 1915, the social relationship of these people was of the finest.

During the many years of her life the deceased enjoyed good health. On or about December 22, 1944, she became ill and seemed to suffer intermittently thereafter until she passed away. Her picture, taken in October 1944, indicates a person of splendid health for her years. Likewise she was favored with a good, clear mind up until the time of her death. This is particularly evidenced by a letter she wrote on January 17, 1945. During the periods of her illness after December 22, 1944, and up until the time of her death the daughter took care of her either in the mother's home in Farnam or at the daughter's home in Grand Island.

When William Johnston died he left an estate consisting of a section of land described as Section 29, Township 9 north, Range 25 west in Dawson County, some properties in Farnam which included a store building, residence, and vacant lots, together with personal property. He also had some land in Texas but this was apparently of no value. However, the real property was encumbered to the extent

of $18,200 and in addition thereto he had some unsecured indebtedness.

He left a will, which was admitted to probate, whereby he gave his wife the life use of this property and the remainder to his daughter. Upon final settlement of the estate in 1918, after payment of all claims and costs of administration, the assets consisted of all the real property, subject to mortgages of $18,200 and $1,549.51 in cash.

In 1918, the mother and daughter made a settlement of their interests in the assets of this estate by division thereof. By this settlement the daughter took the west half of Section 29 and paid the mother $8,000. The mother took the balance of the assets of the estate plus the $8,000 from her daughter and agreed to pay off the $18,200 of mortgage indebtedness.

The evidence shows the daughter subsequently sold the land she received for $16,000.

On December 20, 1918, the mother sold her part of Section 29, being the east half, to August Smallfoot for $24,000. She deeded the land to him on February 19, 1919, after receiving $10,000 in cash and taking a mortgage for the balance of $14,000. A later payment of $6,500 reduced the principal amount thereof to $7,500.

After she sold this land on December 20, 1918, the deceased executed a will on January 17, 1919, wherein, after she gave her sister a property in Farnam and her parents, who were then living, each the sum of $1,000, she set up a trust fund of $20,000. It was provided that the income therefrom was to be paid to her daughter during her life. Upon the daughter's death the balance was to go to her grandchildren on certain conditions. If said conditions failed then the balance was bequeathed to Saint Luke's Episcopal Hospital of Kearney, Nebraska. The residue of the estate, both real and personal, was left to her brother-in-law, S. F. Parker, or in case of his death during her lifetime, then such residue was to go to her sister, Minnie T. Parker.

In 1932, because of delinquencies in the payment of interest, the deceased brought foreclosure on the balance of the mortgage indebtedness due from Smallfoot on the land sold to him in 1918, being the east half of said Section 29. The amount due thereon was $7,500 principal plus interest from March 1, 1928. By virtue of this proceeding she obtained title to this land on August 21, 1933.

Thereafter, on November 20, 1934, the deceased had N. M. York prepare for her the will which she executed on November 24, 1934. This is the will from which the one now being offered for probate was copied. Insofar as the contestant is concerned this will changes the provisions for her benefit from the income of $20,000 during her lifetime, as provided in the will of 1919, to a life estate in the half section of land which was repossessed in 1933.

There are other changes in this will from that contained in the will of 1919. It does not make any provision for her parents, both of whom had died in the interim; it bequeaths the sum of $1,000 to each of her nieces; and it more specifically provides for a division of her property based on the source of its acquisition.

That she knew the contents of these wills, particularly the ones executed in 1934 and 1941, is evidenced by her conversations with others in regard thereto. Numerous witnesses testified to their discussing this matter with her and that she told them how she had her will fixed and why she wanted it that way. If she had any desire to change the provisions thereof certainly she could have done so during the many years following their execution.

It is true that by the provisions of this will the residuary part of her estate was considerably enlarged for not only had she repossessed the land, which she had sold and in which she was giving her daughter a life estate, but she had received $16,500 from this sale, all of which had not been used to pay off the mortgage indebtedness thereon. In addition thereto she had received the earnings from her properties plus her share of her father's estate. However, the testatrix had the right to dispose of her property as she

pleased and unless it is shown here that such change was caused by undue influence practiced upon her the will here offered must be allowed and admitted to probate.

From the estate of her father, Mason J. Tufts, the deceased and her sister each received a one-half interest in 60 shares of stock in the Farnam Bank, certain real property located in Farnam, which the deceased in her will devised to her sister, and the sum of $2,913.58 in cash.

While the deceased was at all times on friendly relations with her daughter and her family, however, she never discussed her business affairs with them in any manner whatsoever. Whether this was due to the fact, as intimated, that Pree Ralston's brother, Hugh, for a time managed a competitor bank in Farnam, or because of her lack of confidence in Pree Ralston's business ability, the record showing she was familiar with his financial difficulties, or due to any difference arising out of the settlement of the William Johnston estate is not shown by the record.

That she always looked to her brother-in-law, Samuel F. Parker, for business advice even before her husband's death and continuously thereafter is established by the record. Whether this was due to the fact that her father had stock in the bank which he managed and part of which stock she inherited or for other reasons is not clear from the record, but the fact remains that he at all times advised her and she sought his advice.

It is primarily out of this relationship and the dealings had pursuant thereto that contestant claims undue influence was established.

In handling her affairs the evidence shows the deceased, after she received some money from the sale of her land in December 1918, started keeping a book of her accounts. This was kept in her handwriting from the time of its beginning in January 1919 up to and through the year 1925. Thereafter, up until the time of her death, it was kept in the handwriting of Samuel F. Parker. This record, consisting of three books, is a detailed record of all transactions and a true record thereof. It sets forth all money received, from

whom, and what for. Also, it sets forth all money paid out, to whom, and what for. It is a very complete record of the transactions of the deceased over this long period of time and correctly reflects what was done.

In connection with the handling of her affairs Parker had authority to draw against her account and continuously did so. He either advised her of a loan before or after it was made. The evidence shows she made some of the loans herself and that she approved all of those he made. During the time she made the entries she kept the books. Thereafter, although he made the entries, she was constantly consulted in regard thereto and the books were generally left in her possession. It appears that no effort was made in any way to keep from her full information of her business dealings and from the record it is apparent that she was fully informed in regard thereto.

As a whole the investments made over these many years were good. They left her free of financial worry and she had a very substantial estate at the time of her death. While it is true that some loans, all of which will hereinafter be referred to, resulted in losses they are not large and do not cast any reflection of bad faith or even poor business judgment upon her adviser.

Contestant makes considerable complaint of borrowings made by Samuel F. Parker himself and particularly of the fact that he paid no interest thereon. The record shows that in the beginning, as early as 1919 and even prior thereto, the deceased made these loans herself. That in the beginning he did pay interest but after he refused to accept anything for his services she refused further interest payments and, in fact, made refunds of what he had already paid. The last refund was in the sum of $305 on December 6, 1927. After that date no interest was paid although substantial borrowings were made. The record shows that outside of the payment of $150 commission in 1929 on a real-estate sale, from which she made approximately $1,500, that he was never paid for the services that he rendered. Although a balance of $1,276.37 was not paid until

on August 9, 1945, being after her death, all money he borrowed has been repaid. This includes two items in 1929 totaling $1,500 and marked "grain" or "grain account." It appears that these dealings were all made with her knowledge and approval and in view of their relations, whereby he received nothing for his services, they do not constitute taking any unfair advantage.

What has been said of the loans to Samuel F. Parker himself can be said of the loans to other members of his family including Sara J. and C. Burr Parker, her husband; John A. Rowland, husband of Margarette; and W. R. Parker, a nephew. Most of these loans had their beginning by loans made or approved by the deceased herself. They were at a low rate of interest and so made by her or with her approval and continued thus with her knowledge and consent. No loss was shown on any of these loans and such balances as remained due at her death have, or at the time of trial were about to be paid. No loss is indicated thereon.

As to other loans the contestant calls attention to the William Peterson mortgage loan made on May 29, 1922, in the sum of $3,350. Subsequently the mortgagee decided to move to California and conveyed the property to the deceased. From a sale of the security she received approximately $1,750 and had left a vacant business lot and a small residence property of not too much value. Some loss was undoubtedly sustained on this loan but it was made many years ago and with her approval.

Complaint is made of the Roth mortgage loan purchased from the Farnam Bank on October 3, 1929, for the principal and accrued interest in the total of $4,144. However, the record shows no apparent loss on this loan but probably a gain. After receiving a payment reducing the loan to $2,500 the deceased was required to take over her security. It is apparent that from what she received from a sale of part thereof, in addition to the balance as listed in her estate, that a gain rather than a loss resulted therefrom.

On March 29, 1920, a loan of $1,655.74 was made to Franzen. He paid thereon on July 27, 1920, the sum of

$1,000 plus interest of $32.90. Thereafter a settlement was being negotiated for the balance when he suddenly died. He left no estate from which the balance could be collected.

On September 26, 1931, a loan of $162.68 was made to George Land. He died shortly thereafter and a claim therefor was filed against his estate. Apparently he did not have sufficient assets to cover his debts or any part thereof as no payment has ever been received.

These cover the principal items complained of in the loans. Considering the length of time concerned, which includes the period from 1932 to 1941, the number of loans made and the amounts thereof, it seems to be a very satisfactory result. No adviser can be perfect in his loan approvals.

Further complaint is vigorously made of a deal involving her bank stock in the Farnam Bank in which deceased had inherited some stock from her father. She and her sister had each inherited 30 shares of stock. The bank had borrowed $10,000 from R. F. C. and had placed certain of its stock as security therefor, thus reducing the holdings of each stockholder. As a result thereof and immediately prior to the deal here being discussed the stockholders and the number of shares of stock each owned were as follows:

| | |
|---|---|
| Minnie T. Parker | 15¾ |
| Dora Frances Johnston | 15¾ |
| Samuel F. Parker | 57%₀ |
| John A. Rowland | 8⅖ |
| C. L. Dunham | 7⅛ |

After the loan was made the bank paid off $3,000 of the money borrowed so that in 1942 only $7,000 was still due. Of that amount Samuel F. Parker and Minnie T. Parker paid $3,000 and Dora Frances Johnston $4,000.

After this was paid the stock was reissued so that each stockholder thereafter owned the following:

| | |
|---|---|
| Minnie T. Parker | 39½ |
| Dora Frances Johnston | 59½ |
| Samuel F. Parker | 80 |

John A. Rowland_____12
C. L. Dunham_____ 9

Contestant complains because by this arrangement the deceased received only 43¾ additional shares for her $4,000 whereas the Parkers received $46^{21}/_{40}$ additional shares for their $3,000. In this respect contestant overlooks the fact that by reason of the $3,000 paid by the bank, in which all stockholders were entitled to share, the $10,000 had already been reduced to $7,000 and that $^{3}/_{10}$ of the reissued stock should therefore be prorated to all of the stockholders on the basis of the shares of stock held. The balance, or $^{7}/_{10}$, should be divided to those who paid the $7,000 on the basis of their payments. With this as a basis the division is properly made and is the reason John A. Rowland and C. L. Dunham were entitled to additional stock although they did not put in any additional money.

While the foregoing does not set out in all its detail the business and family life of these people over the many years here involved, it does, however, present a sufficient picture of what is contained in the record so that the question of whether or not the matter should have been submitted to a jury can be determined. Any further details would serve no useful purpose.

Analyzing what the record contains to see if there is any evidence to establish those elements necessary to warrant the rejection of a will on the grounds of undue influence we find the following:

With reference to whether the testatrix was subject to such influence, the evidence is that the testatrix was a woman active for her years. She participated in civic and community affairs, traveled, worked in her church, and enjoyed visiting with her family, relatives, and friends. For many years after her husband's death she kept her own account of her business and up until her death kept in close and constant touch therewith. Her health was good up until some six months prior to her death and her mind was clear up until her death.

That the opportunity to exercise it existed is self evident. Samuel F. Parker was her relative, close friend, and confidential business adviser, a person in whom the deceased placed great confidence.

Does the evidence show there was a disposition to exercise it? We think no such evidence appears in the record. In fact it is very much to the contrary. In his dealings with the deceased Samuel F. Parker always kept her fully informed of what he was doing and consulted with her in regard thereto. Full and complete accounting was constantly kept thereof and left in her possession. Over the many years of their dealings there is not one word of evidence that she ever complained to anyone in regard thereto. Such opportunity often presented itself, especially when the daughter lived at her home. Nothing is shown that he ever gained anything out of these dealings. It is true he did not pay interest on the money he borrowed but that was because she expressly refused to take it and refunded what had been paid.

Does the result appear to be the effect of such influence? We think the evidence would not support such a finding. From the very beginning in 1919, when she made her first will, down to the will of 1941, it is evident that the deceased did not want her daughter to have any property outright. In this connection it is significant that she never discussed her business with or sought the advice of the daughter or her husband in regard thereto. After she sold her half of the farm in December 1918, she executed the will of 1919, therein leaving her daughter a life income from a fund of $20,000. Thereafter, after she regained title to this land in 1933, she executed the will of 1934, of which the will here offered is a copy, giving her a life estate in said lands. That she fully understood the terms of the will of 1934 and 1941 is evidenced by the testimony of many witnesses with whom she talked and to whom she related what she had provided therein. It is true that her sister and brother-in-law, Minnie T. and Samuel F. Parker, receive a substantial share in her estate but she had a right to leave her property to whom-

ever she desired. The record discloses she was a widow for many years and that she enjoyed these years of her life free from financial worries and was able to do the things she liked. Based on that experience she long had a plan to leave her property in the manner set forth in her will. Nothing in the record shows any influence exercised upon her such as to destroy her freedom in determining what to do with her property after her death. On the contrary, it shows a long period of faithful and friendly service to the deceased which endeared these people to her and out of that feeling arose a desire in her to reward them in her will. There is nothing in the record that these people ever sought to influence the deceased away from her daughter. In fact the only evidence is to the contrary for up until the day she died they were on the most friendly terms. Such fine friendships as here existed between these relatives over the many years of their close relations is a splendid tribute to their faithful and honest dealings between themselves.

From the record as a whole it would clearly have been error to submit this case to a jury on the question of undue influence for there is no evidence in the record that would support such a finding.

The contestant further complains that the court erred in refusing to permit her to introduce certain evidence which she offered. Some of these are as follows: The source of certain loans which Samuel F. Parker made for deceased; that they came through the bank of which he was in active charge; the nature thereof; and that the deceased often used the expression "Am I broke?" While we do not think the court erred in sustaining objections thereto, however, even if admitted they would not add facts sufficient to require the case to be submitted to a jury.

For the reasons herein stated we find the judgment of the lower court to be correct and the same is affirmed.

AFFIRMED.