IN RE ESTATE OF LYDIA F. EVANS, DECEASED.
JOHN P. JENSEN ET AL., APPELLANTS, V. MARTHA E. PRIEBE ET AL., APPELLEES.
80 N. W. 2d 127

Filed December 28, 1956. No. 34037.

*Munro & Parker,* for appellants.

*Joseph C. Tye* and *Stewart & Stewart,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Lydia F. Evans, a resident of Kearney, Buffalo County, Nebraska, died June 25, 1954, when she was almost 86 years old. She left an estate consisting of real and personal property appraised at $117,686.21. On July 3, 1954, John P. Jensen, as named executor, filed her purported will and codicil thereto, together with a petition seeking probate thereof in the county court. Thereto Franklin F. Evans, Galen Evans, and Martha E. Priebe, who were the only children and sole heirs at law of Lydia F. Evans, filed objections, together with a purported revocation of such will and codicil. After hearing in the county court a decree was rendered, finding and adjudging that the will and codicil had been duly executed as required by law at a time when testatrix had testamentary capacity, but that likewise while having testamentary capacity and without undue influence, she had thereafter duly executed a revocation thereof, and died intestate.

Therefrom John P. Jensen and Maurice F. May, a nephew of testatrix, hereinafter designated as proponents or by name, appealed to the district court where new pleadings were filed, to wit: Proponent's petition seeking probate of the purported will and codicil; the answer of contestants, denying generally and alleging at length a subsequent revocation thereof by Lydia F. Evans, hereinafter called testatrix; and proponents' reply denying generally and alleging that such "revocation was executed by said testatrix by reason of *improper and undue influence* exerted upon the mind of the testatrix by Franklin F. Evans," hereinafter called Franklin, and that testatrix lacked testamentary capacity at the time of its execution. (Italics supplied.)

Thereafter, upon trial to a jury, it returned a verdict

for contestants, finding that the revocation was the true and valid revocation of testatrix, and judgment was rendered in conformity therewith. Proponents' motion for new trial was overruled, and they appealed to this court, assigning that: (1) The verdict was not supported by the evidence but was contrary thereto and contrary to law; (2) the court erred in the admission and exclusion of certain evidence; and (3) the court erred in giving instructions Nos. 5 and 9. We conclude that the assignments have no merit.

In that connection, proponents also assigned and argued that the substance of the rule of law contained in instruction No. 10 was erroneous because it was incomplete, and that instruction No. 18 was erroneous because the substance of the informative rules of law contained therein was duplicitious and misleading. However, proponents' motion for new trial did not assign that such instructions were erroneous, and they will not be reviewed by this court. In Muller v. Jensen, 144 Neb. 1, 12 N. W. 2d 80, we held: "Error alleged in an instruction to the jury must be called to the attention of the trial court, in the motion for a new trial, before it will be considered by this court."

In In re Estate of Kaiser, 150 Neb. 295, 34 N. W. 2d 366, we held: "Issues of fact in will contest cases are determined in this court by the sufficiency of the evidence under the law to sustain the verdict of the jury or the findings of the district court, and where the evidence in a case tried to the jury is conflicting, issues of fact are questions for its determination."

In Remmenga v. Selk, 150 Neb. 401, 34 N. W. 2d 757, reaffirmed on rehearing in Fuss v. Williamson, 160 Neb. 141, 69 N. W. 2d 539, we held that: "In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced there-

from." See, also, In re Estate of Farr, 150 Neb. 615, 35 N. W. 2d 489.

In that respect, the record conclusively shows and it is undisputed that on January 22, 1951, Jensen, a lawyer at Kearney, drew the last will and testament for testatrix, then 82 years old. Such will was then duly executed and attested as provided by law at a time when testatrix had testamentary capacity.

Item X of the will nominated and appointed Jensen as executor with full power at his discretion to do any and all things necessary for complete administration of her estate, including the power to sell at public or private sale and without order of court any real or personal property belonging to her estate and to execute and deliver a good and sufficient deed or bill of sale thereto. It further empowered him to compound, compromise, or otherwise settle or adjust any and all claims, charges, debts, and demands whatsoever against or in favor of her estate, as fully as she could do if living.

Item II directed the executor to sell at public or private sale, at any price deemed sufficient to him, and deliver deeds to the purchaser of certain described lands. Out of such proceeds he was directed to pay $1,000 to a named church college at McPherson, Kansas; $1,000 to a named biblical seminary in Chicago; $1,000 to a named hospital in Chicago; and $1,000 to the board of foreign missions of a church in Elgin, Illinois. All such institutions were related in some form to Church of the Brethern of which testatrix was a sustaining member. It also provided that if the proceeds of such sale were not sufficient to pay all of such sums, then such respective bequests were ordered decreased proportionately. If a surplus remained after paying such bequests, the remainder thereof was directed to be paid one-half to the Church of the Brethern of Kearney, and one-half to the Nebraska Conference of the Church of the Brethern Camp.

Item III devised certain described lots and a house

owned by her in Kearney to her nephew, Samuel M. Forney, who was the minister of her Church of the Brethern in Kearney and who was present when the will was made. Item IX thereof also devised and bequeathed to him all the residue of her estate.

Item IV devised a described 121.68 acres of land to her three named children, share and share alike. They were contestants herein.

Item V devised certain described lands to her 11 named grandchildren, share and share alike, with provision that in the event of the death of any of them prior to her death, and leaving issue, then such issue should take the share of their deceased parent, otherwise their share should lapse and go to her surviving named grandchildren.

Item VI devised a described house and lots in Kearney to Paul Forney and Stella Forney, his wife, as tenants in common. Paul Forney was an adopted brother of Samuel M. Forney.

Item VII devised her described home to Maurice May, a nephew, who is an appellant herein.

Item VIII provided that certain cash bequests and legacies should remain a lien on all of her estate, and gave the executor like additional powers of sale if the personal property or cash in her estate was insufficient to pay same.

The record is conclusive and undisputed that on February 8, 1951, just 17 days after testatrix had executed her will, Jensen drew the codicil thereto for her. Such codicil was then duly executed and attested as provided by law at a time when testatrix had testamentary capacity. It confirmed and ratified her will in every respect except so far as any part of it was inconsistent with her codicil. Paragraph Second thereof directed that Item II of her will should be changed to direct her executor, Jensen, to sell the same described real estate in the same manner as provided in Item II, and pay from the proceeds thereof $500 to the Church of the Brethern

of Kearney and $500 to the Nebraska Conference of the Brethern Camp, and pay any surplus remaining, after payment of said amounts and payment of the expenses of administration of her estate, to her three named children, share and share alike.

On June 4, 1951, testatrix filed her petition in the county court, alleging that she was 82 years of age and by reason of age and health she was unable to handle all of her business affairs, to wit, the collection of rents and management of her property without having a conservator appointed to advise with her and act for her in such matters. Therein she named her three children, all of age, recited that she owned unencumbered real estate, an automobile, and had about $3,000 in a named Kearney bank. She alleged that her son Franklin was a suitable person to act as conservator, and prayed for his appointment. In such proceeding she was represented by the law firm of which Jensen was a member, and a law firm of which M. H. Worlock was a member. Franklin was appointed conservator as requested and served as such until May 20, 1952, when, at the request of testatrix, the conservatorship was terminated, the conservator's accounts and final report were approved, he was released as such, and his bondsman was discharged upon a showing that a balance of $9,866.59 owing to testatrix had been paid and receipted for. In that connection, Jensen testified that he never had any notice of termination of the conservatorship, but it is admitted that on December 3, 1952, Worlock mailed Jensen's law firm a check for $150, same being one-half of the attorney's fees finally collected in that proceeding, and Jensen's firm cashed the check and kept its share of the fee.

In the meantime, the will and codicil of testatrix had permissively remained for a while in Jensen's office. Thereafter, she decided that she wanted to destroy her will and codicil and leave all of her property to her three children. However, despite repeated requests and demands made by Franklin while conservator, by testa-

trix personally, and by another attorney employed by her, Jensen refused to deliver them to her upon the pretext that it was his duty to protect the rights of other persons interested therein.

Finally, on September 14, 1951, after she had previously consulted Worlock who had represented her in some other matters, they went to Jensen's office, where testatrix and her attorney both requested and demanded delivery of the will and codicil to her, but delivery was refused.

Thereafter, on September 15, 1951, by prearrangement, testatrix returned to the office of Worlock where at her request he drew a "Revocation of Last Will and Testament and Codocil Thereto of Lydia F. Evans" for her. The revocation, having all the formalities of a will, recited: "That I, Lydia F. Evans, a resident of Kearney, Buffalo County, Nebraska, and being of sound mind and memory and having heretofore and in January 1951 signed and executed an instrument as my then last Will and Testament and having, in February 1951, made a Codicil thereto, do now on this 15 day of September, 1951 irrevocably cancel and revoke said last Will and Testament and the Codicil thereto and it is now my (will) and desire, and I do hereby direct that upon my death all of my property, both real, personal and mixed and wheresoever the same may be situated, shall descend to and vest in my heirs at law in accordance with the statutes of descent and distribution of the State of Nebraska and in the same manner and (as) though I died intestate."

The record is conclusive and undisputed that such revocation was then duly executed and attested as provided by law at a time when testatrix had testamentary capacity.

Thereafter, on May 21, 1952, testatrix executed separate warranty deeds of all her respectively described real estate except two lots to her three named children. Each deed recited a consideration of love and affection

and reserved a life estate in grantor. Each of such deeds was duly recorded on May 24, 1952. They were simply factual circumstances tending to establish the determined and continuous intention of testatrix to see that her property went to her children, two of whom were never charged with any undue influence. Such deeds are not otherwise directly involved in this appeal.

Proponents concede in their brief that the question involved is: "whether the instrument entitled 'Revocation of Last Will and Testament and Codicil thereto of Lydia F. Evans' executed September 15, 1951, was executed by the testatrix by reason of *improper and undue influence* exerted upon the mind of the testatrix by Franklin F. Evans." (Italics supplied.)

In that connection, instruction No. 5 told the jury that: "You are instructed that the due execution and Attestation of the will of Lydia F. Evans dated January 22nd, 1951, and the codicil thereto dated February 8th, 1951, and the fact that she was possessed of testamentary capacity at said times, have been established by the evidence.

"You are instructed that the due execution and attestation of the purported revocation of said will dated September 15th, 1951, and the fact that the said Lydia F. Evans possessed sufficient mental capacity and competency to make such purported revocation at said time, have been established by the evidence.

"You are instructed that you will accept the above facts as proven."

In that respect, proponents assigned and argued that use of the words "due execution" in instruction No. 5 was prejudicially erroneous because it may have been tantamount to an instruction that the jury must find the revocation had been executed without any undue influence. The contention has no merit. As a matter of fact, the first sentence of instruction No. 6, immediately following, told the jury: "You are instructed that the only issue which is submitted to you for your determina-

tion is whether or not the purported revocation was obtained by reason of undue influence." Thereafter followed a clear statement setting forth the respective contentions of both proponents and contestants with regard to undue influence in connection with execution of the revocation. An examination of all instructions given, which must be considered together as instructed by the trial court in instruction No. 22, makes it crystal clear that the jury could not have been misled in any manner by instruction No. 5.

Instruction No. 9, among other things about which no complaint is made, set forth the four essential elements of undue influence as follows:

"1. That the deceased, Lydia F. Evans, was a susceptible person.

"2. Another's opportunity to exert it.

"3. Disposition to do so for an improper purpose, and,

"4. A result clearly showing the effect of such influence."

Proponents assigned and argued that such use of the words "susceptible person" and "disposition to do so for an improper purpose" were erroneous and prejudicial to them. The contention has no merit.

The opinions in In re Estate of Bainbridge, 151 Neb. 142, 36 N. W. 2d 625, and In re Estate of Bowman, 143 Neb. 440, 9 N. W. 2d 801, both set forth and approved the essential elements of undue influence by use of language identical with that used in instruction No. 9 about which proponents complain. Some of our opinions have used the word "subject" instead of "susceptible" but they mean one and the same thing. Some have left out the words "for an improper purpose" but all such opinions have said as much in arriving at decision. The very words "undue influence" mean "wrong influence" which is the antithesis of right influence. Black's Law Dictionary (3d ed.), p. 1777.

As matter of fact, proponents took that very position

not only in their reply to contestants' answer but also in the very first sentence of their brief filed in this court, which stated the question involved. An examination of all instructions given clearly discloses that the jury was otherwise fully and fairly instructed on the issue and elements of undue influence and could not have been misled by instruction No. 9 as argued by proponents. In that connection, In re Estate of Keup, 145 Neb. 729, 18 N. W. 2d 63, referring to the four essential elements of undue influence, held that: "While the four elements must be established by the evidence to make a case sufficient to submit the issue to a jury and to sustain a verdict based thereon, however, it is not necessary that the court give an instruction setting forth the four elements separately provided they are sufficiently contained in the instructions given." See, also, In re Estate of Farr, *supra*.

In In re Estate of Fehrenkamp, 154 Neb. 488, 48 N. W. 2d 421, we held that: "Undue influence cannot be inferred alone from motive or opportunity. There must be evidence, direct or circumstantial, to show that undue influence not only existed, but that it was exercised at the very time the will was executed.

"Mere suspicion, surmise, or conjecture is not enough to warrant a finding of undue influence. There must be a solid foundation of established facts upon which to rest an inference of its existence.

"There may be influences directing the will-maker's attention to proper obligations which it might be thought ought to be satisfied by testamentary provisions. Such influences may be persuasive and effective, but, so long as not coercive, they are not undue. Circumstances often arise where such conduct is wholly justifiable.

"In order to invalidate a will, undue influence must be of such a character as to destroy the free agency of the testator and substitute another person's will for his own." See, also, In re Estate of Thompson, 153 Neb. 375, 44 N. W. 2d 814.

The evidence with relation to alleged undue influence or the absence thereof in connection with execution of the revocation is voluminous. In that connection, there is ample competent evidence adduced by several witnesses who knew the facts, from which it could reasonably be concluded that testatrix was not a susceptible person. There is ample competent evidence that she was a handsome, competent, intelligent, religious old lady who loved her three children with whom she had a close, informative, and trustworthy family relationship. She was a strong-minded woman. She had a mind of her own and could not be easily influenced. She lived alone, and, although her eyesight was gradually failing the last part of her life, she generally looked after her own business affairs either alone or with some assistance from her children, particularly Franklin, who generally kept her informed with relation thereto. Her nephew, Samuel M. Forney, who was her pastor and a substantial beneficiary in her will, frequently visited with her at church and in her home up to the time when she went to the hospital 2 weeks before her death, testified as a witness for proponents. He testified that he never saw her when she was incompetent; that she was a strong-minded woman and had a mind of her own; that her mind and expressions were clear; and that she knew what she wanted. When asked on redirect as to whether or not testatrix was susceptible to influence by her son Franklin, he answered: "Well, as I said awhile ago, she had a mind of her own; and oftentimes her opinions and Franklin's clashed, and they didn't always agree in everything; but, I think he would have had a little difficulty in persuading her verbally to change her mind very much."

Franklin testified that he never tried to influence his mother to make the revocation; and that she had been wanting her will and had asked him for it many times, insisting that he get it. She told him to sue Jensen to get it, so he talked to Worlock whose suggestion was,

" 'Well, tell her to make another will and that will cancel the other one.' " He thereupon told his mother that she could make another will and that would cancel the first one which Jensen had, and she said, "I don't want a will." Franklin also testified that all he did was to take her down to Jensen's and Worlock's offices when she requested him to do so.

Her son Galen G. Evans testified that sometimes testatrix would ask Franklin for help and he would help her, and that she was not under the influence of Franklin but had a mind of her own. He testified that he never saw Franklin try to influence his mother; that his mother never told him that Franklin ever tried to influence her; and that testatrix would talk about the will Jensen had drawn and on as many as 50 or 75 or more occasions she said she wished she could get it back. She wanted him to help get it for her so that everything would go to her children, but he told her that he thought Franklin was doing about all he could to protect her interests.

Martha Priebe testified that testatrix, her mother, was not easily influenced but had a will of her own; that she was trying to do too much for a lady of her age and would be worried because she could not get her will back from Jensen, so she would ask Franklin to help her; that she had never seen Franklin try to influence his mother; and that her mother never complained about the way Franklin handled her affairs. She testified that many times, quite frequently, her mother would say, " 'Mr. Jensen won't give me that will. I want that will back,' " which fact upset and worried her mother.

As in most cases Franklin had ample opportunity to exert undue influence and a motive for doing so, since he had seen a copy of the will, but that alone is not enough. Testatrix had a car, but others drove it for her, or her children took her about in her car or their own when she requested it. On January 27, 1951, within 5 days after making her will, Franklin at her request

took her to Jensen's office. Jensen was not there so she told his secretary that she wanted her will. She was told that the secretary could not give it to her, but to wait for Jensen. She waited but he did not come to his office, and she finally left.

A week or so later she went again to Jensen's office where Franklin came in later. However, Jensen was not in, so she told another member of his firm that she wanted her will, whereupon he prepared and gave her a copy of it, but refused to give her the original when she said, " 'I want the signed copy.' "

On September 14, 1951, she again went to Jensen's office and demanded her will. Franklin took her there at her request, where Jensen again refused to deliver it. He did call Worlock with whom she had previously consulted about the matter, whereupon Worlock came over to Jensen's office and asked Jensen, " 'Why don't you give Mrs. Evans her will; she is entitled to it; it is her will, and you should give it to her,' " but Jensen refused, upon the pretext that " 'I have the rights of these other people to protect, and if I gave you this will you would destroy it, and I am not going to give it to you.' " In that connection, Jensen was her attorney, without any obligation to protect the rights of other persons. She had testamentary capacity at that time and such a reason as that given by Jensen would not prevent her or anyone duly authorized by her from demanding and receiving possession of her will and codicil from him. If under no disability, she had a right to intentionally destroy, alter, or revoke her will and codicil thereto. See, sections 30-201, 30-204, and 30-209, R. R. S. 1943, which prescribe the manner of doing so.

In conformity therewith, on September 15, 1951, Worlock prepared the revocation as requested by testatrix. He testified that while she was alone with him in his private office, and, having a mind of her own, she duly executed it, saying that she did not want a will, that she wanted her property to go to her children. He testi-

fied that she was then competent, which is undisputed; that she did not appear to be under any restraint or influence; and that Franklin, who brought her to his office, had nothing to do with the contents or execution of the revocation. Worlock and his secretary were the attesting witnesses. The secretary verified by her own testimony that testatrix was then competent and appeared to be under no restraint or influence.

During the summer of 1951 testatrix told two unrelated friends, who testified for contestants, that she wanted her will that Jensen had made for her but he refused; that he was trying to give her property to everybody other than her children; or that she was having trouble with Jensen about getting her will. On January 1, 1953, she told another friend that she would feel better if she could get what belonged to her, meaning her will, that Jensen had in his possession.

As late as January 17, 1952, some 4 months after execution of her revocation, she wrote out the following in her own words and handwriting: "Kearney Nebr Jan 17 1952 Mr. John Jensen I'd like to have my will. It belongs to me. You said I could have it any time I would ask you for it. You refused to give it to me when I asked you for it. Lydia F. Evans Kearney Nebr House No 716 St E 27." She never sent it to Jensen, but subsequently handed it to Franklin who produced it in this trial where, over objection, it was admitted in evidence. Without citing any authority, proponents assigned and argued that its admission was prejudicially erroneous. The contention has no merit. It was admissible for the purpose of tending to prove the condition of her mind and unbiased inclination in the disposition of her property as a material element in determining whether or not undue influence was actually exerted at the time of execution of her revocation. It also corroborated the oral testimony of numerous witnesses to the effect that testatrix continuously wanted to obtain possession of her will in order that her children could surely get all

of her property. See, Dame, The Law of Probate and Administration (3d ed.), § 158, p. 165; In re Estate of Johnson, 100 Neb. 791, 161 N. W. 429.

There was ample competent evidence from which it could have been reasonably concluded that Franklin as a son was attempting to assist his mother and was not disposed to exercise undue influence upon her for an improper purpose. It follows also that the jury could reasonably have concluded that the revocation executed by testatrix in order that her children could get her property was only the natural desire of a loving and thoughtful parent and that such result did not clearly show the effect of undue influence.

We deem it unnecessary to recite here the evidence adduced by proponents conflicting with that of contestants upon the issue of undue influence. It is sufficient to say that such issue was properly submitted to the jury and by it determined in favor of contestants. Such actions are not for trial de novo here, but we are bound by the jury's verdict where as here the verdict and judgment were not clearly wrong because there was sufficient competent evidence to sustain it. In re Estate of Keup, *supra.*

There remains only the question of whether or not the trial court erred in excluding certain evidence offered by proponents. It appears that on April 26, 1948, testatrix executed a will which she subsequently destroyed. A copy of such will was offered by proponents and received in evidence over objection of contestants. In that connection, proponents also offered in evidence an alleged statement of testatrix made by her on April 23, 1948, in an alleged conversation with Jensen regarding the execution of such will. Its admission was refused upon the ground that it was too remote and without any bearing upon the issues presented for determination. Without citing any authority, proponents assigned and argued that such refusal was prejudicial error. The contention has no merit. Such conversation occurred 3

years, 4 months, and 22 days before the execution of the revocation involved. It could only have a tendency to establish that testatrix had testamentary capacity at that time, which was at all times undisputed or conclusively established, and never an issue for the jury. The statement had nothing whatever to do with the will executed January 22, 1951, or the codicil thereto executed February 8, 1951, or the revocation here involved which was executed September 15, 1951. The trial court did not err by excluding it.

Proponents also offered in evidence a petition for appointment of a guardian for testatrix, filed in the county court of Buffalo County by Franklin on April 23, 1948, and the answer thereto, filed by Jensen's firm April 26, 1948, but their admission was refused as too remote, incompetent, irrelevant, and immaterial. However, proponents were previously permitted to show that such a petition and answer had been so filed and that the proceeding had been subsequently dismissed without appointment of a guardian or any other action having been taken therein. Without citing any authority, proponents assigned and argued that refusal to admit the record of such proceedings was prejudicial error. The contention has no merit. As was said with respect to related matters in Carter v. Gahagan, 102 Neb. 404, 167 N. W. 412: "We conclude the record should have been excluded."

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed. All costs are taxed to proponents John P. Jensen and Maurice F. May.

AFFIRMED.